THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

MURPHY CREEK ESTATES, LLC, a Colorado limited liability company,

      Plaintiff,

v.

MURPHY CREEK ESTATES FUNDING, LLC, a Colorado limited liability company formerly known as Murphy Creek Estates Funding, LLP;
WHITEHALL FINANCIAL CORPORATION, a Colorado corporation;
WHITEHALL FINANCIAL, LLC, a Colorado limited liability company;
HOMESTEAD RESOURCES, LLC, a Colorado limited liability company;
COSCAN COMMERCIAL CORPORATION, a Nevada foreign corporation;
DANIEL L. MCCRACKEN; an individual;
WILLIAM R. WOOD, an individual; and
DFH MANDARIN, LLC, a Florida limited liability company,

      Defendants.

---

## VERIFIED COMPLAINT

---

      Plaintiff Murphy Creek Estates, LLC ("MCE"), by their counsel Montgomery Little & Soran, PC, hereby submits its Verified Complaint, and in support thereof states as follows (this "**Complaint**" or this "**Action**"):

### PARTIES & OTHER RELEVANT INDIVIDUALS AND ENTITIES

      1.    Plaintiff MCE is a Colorado limited liability company doing business in Colorado, with a registered address of 5445 DTC Parkway, Suite 800, Greenwood Village, CO 80111.

      2.    G & G Consulting, Inc. ("**G & G**"), as referenced herein, is a Nevada corporation that is presently the sole member of MCE.

3.      Defendant Murphy Creek Estates Funding, LLC is a Colorado limited liability company doing business in Colorado, with a principal office address of 1422 Pineridge Place, Castle Pines, Colorado 80108.

4.      Murphy Creek Estates Funding, LLC was formerly known as Murphy Creek Estates Funding, LLP. Accordingly, herein, both Murphy Creek Estates Funding, LLC and Murphy Creek Estates Funding, LLP will be referred to as "**MCE Funding**."

5.      Defendant Whitehall Financial Corporation ("**WFC**") is a Colorado corporation with a principal office address of 1422 Pineridge Place, Castle Pines, Colorado 80108.

6.      Defendant Whitehall Financial, LLC ("**WFLLC**") is a Colorado limited liability company with a principal office address of 1422 Pineridge Place, Castle Pines, Colorado 80108.

7.      At times in this Complaint, Plaintiff may refer to Defendants WFC and WFLLC, collectively, as the "**Whitehall Entities**."

8.      Defendant Homestead Resources, LLC ("**Homestead**") is a Colorado limited liability company with a principal office address of 1422 Pineridge Place, Castle Pines, Colorado 80108.

9.      Defendant Coscan Commercial Corporation ("**Coscan**") is a Nevada corporation with a registered address of 2248 Meridian Blvd, Suite H, Minden, Nevada, 89423.

10.     According to the Colorado Secretary of State website, Coscan is registered to conduct business within the state of Colorado with a principal office address of 1422 Pineridge Place, Castle Pines, Colorado 80108.

11.     Defendant Daniel L. McCracken ("**Mr. McCracken**") is a resident of the State of Colorado with a residential address of 1422 Pineridge Place, Castle Pines, Colorado 80108.

12.     Upon information and belief, Defendant William R. Wood ("**Mr. Wood**") is currently a resident of Rosarita Beach, Mexico, with an unknown residential address.

13.     At all times relevant to this Action, Mr. McCracken and Mr. Wood were majority members, shareholders, and/or owners of at least the following entities: MCE Funding, the Whitehall Entities, and Coscan.

14.     At all times relevant to this Action, Mr. McCracken and Mr. Wood were also principals, officers, and/or managers of at least the following entities: MCE Funding, the Whitehall Entities, and Coscan.

15.     Upon information and belief, at all times relevant to this Action, Mr. McCracken was a member of Homestead.

16.     Upon information and belief, at all times relevant to this Action, Mr. McCracken was a principal and/or manager of Homestead.

17.     DFH Mandarin, LLC ("**DFH**") is a Florida limited liability company with a principal business address of 14701 Philips Highway, Ste. 300, Jacksonville, FL 32256.

18.     DFH is the buyer in a contract pending for the sale of a portion of the Land, as defined herein, that is the subject of this dispute. DFH is named as a party herein only insofar as it has material rights and interests that will be affected by the relief sought herein, making it an indispensable party under both Fed. R. Civ. P. 19 and Colo. R. Civ. P. 19. Plaintiff does not seek monetary relief from DFH for any of the claims asserted herein.

19.     "**Defendants**", as used herein, refers collectively to the following: MCE Funding, WFC, WFLLC, Mr. McCracken, Mr. Wood, Homestead, Coscan, Mr. McCracken, and Mr. Wood. DFH is not included within this collective term unless specifically referenced.

20. Arthur Eugene Bokemeier ("**Mr. Bokemeier**") is an individual referenced in this Complaint insofar as his role as the Trustee of the Frances Chase Bokemeier Trust A and the Frances Chase Bokemeier Trust B.

21. In his capacity as Trustee, Mr. Bokemeier was a former member of MCE.

22. Unless explicitly stated otherwise, all references herein to Mr. Bokemeier are in his capacity as Trustee and member of MCE, and not in his individual capacity.

23. California Construction Consultants, Inc. ("**CCC**") is a California Corporation referenced herein insofar as its role as an initial member of MCE and as predecessor in interest to G & G.

24. Kris Kristjansson is and always has been the president of G & G, and was the president of CCC during the time in which CCC was a member of MCE.

25. Unless explicitly stated otherwise, all references herein to Mr. Kristjansson are in his capacity as president of G & G, which in turn is a member of MCE, and not in his individual capacity.

## JURISDICTION AND VENUE

26. This Action centers on actions which occurred in Arapahoe County, Colorado, concerning MCE and a 243-acre parcel of raw land located at 24785 East Mississippi Avenue, City of Aurora, Arapahoe County, Colorado (the "**Land**"). Accordingly, venue is proper in the District of Colorado.

27. Each of the named Defendants, including DFH, is either a resident of the State of Colorado, or has conducted business transactions in the state of Colorado, many of which concern the Land situated in Arapahoe County, Colorado; thus, each of the named Defendants,

including DFH, are subject to the jurisdiction of the courts of general jurisdiction in the state of Colorado pursuant to Colo. Rev. Stat. § 13-1-124. This Court has jurisdiction over each Defendant.

28.     This court has subject matter jurisdiction over this Action because Plaintiff asserts a claim for relief based upon a federal question pursuant to 18 U.S.C. § 1331. Specifically, Plaintiff has a claim for relief under 18 U.S.C. §1964 (RICO), and each of Plaintiff's other claims arising out of state law derive from the same common nucleus of operative facts.

## GENERAL ALLEGATIONS

### A.  Formation of MCE

29.     On August 31, 2002, CCC and Mr. Bokemeier executed the original Operating Agreement for MCE ("**Operating Agreement**"), attached hereto as **Exhibit 1**.

30.     Under the Operating Agreement, Mr. Bokemeier contributed real property in the form of the Land, then valued at $5,500,000.00, to MCE for a 50% ownership interest in MCE.

31.     Through the Operating Agreement, Mr. Bokemeier reserved priority payment, before distribution of profit to any member, for the recoupment of the $5,500,000.00 land value contribution, to be paid as a formula percentage of each lot sold from the Project. *See* Ex. 1, ¶ 3.2.1.

32.     Pursuant to the Operating Agreement, CCC contributed its services to MCE for a 50% ownership interest in MCE.

33.     Pursuant to the Operating Agreement, profits were to be allocated 80% to CCC and 20% to Mr. Bokemeier, with losses allocated equally. Ex. 1, ¶ 4.1.

34.     CCC and Mr. Bokemeier intended for MCE to develop and sell the Land, sometimes referred to in the Operating Agreement and other documents as the "**Murphy Estates Project**," and herein as the "**Project**."

35.     Pursuant to the Operating Agreement, MCE is a manager-managed limited liability company.

36.     Pursuant to the Operating Agreement, CCC was initially elected Manager of MCE. Ex. 1, § 5.2.

37.     Pursuant to the Operating Agreement, certain limitations on the powers of a manager exist, including but not limited to the requirement that a manager must obtain the affirmative vote or written consent of a majority of members for the following transactions:

    a.  "The sale, exchange or other disposition of the Murphy Estates Project…" (Ex. 1, § 5.3(B)(I));

    b.  "Transactions between the Company and the Manager or one or more of any Manager's Affiliates, or transactions in the Manger or one or more or any Manager's Affiliates, has a material financial interest." (Ex. 1, § 5.3(B)(vi));

38.     The Articles of Organization for MCE were filed with the Colorado Secretary of State on or about November 8, 2002, and a copy of same are attached hereto as **Exhibit 2**.

39.     On December 12, 2002, Mr. Bokemeier conveyed title to the Land to MCE.  A copy of the warranty deed is attached hereto as **Exhibit 3**.

### B.  *Admission of Special Managing Member*

40.     In early 2003, CCC, through Mr. Kristjansson, interviewed individuals with experience developing subdivisions in Colorado in order to obtain local assistance with the Project.

41.     During that time in early 2003, Mr. Kristjansson was referred to Mr. Wood as an individual with experience with developments similar to the Project.

42.     Mr. Wood in turn introduced Mr. Kristjansson and Mr. Bokemeier to his business partner, Mr. McCracken.

43.     Mr. Wood and Mr. McCracken offered their services to assist with the Project through their own entity, WFC.

44.     Upon information and belief, at all times relevant to this Action, Mr. McCracken and Mr. Wood have been principals and shareholders of WFC.

45.     After some discussion, Mr. Kristjansson, on behalf of CCC, and Mr. Bokemeier agreed to hire WFC as Special Managing Member of MCE to assist with the development of the Project.

46.     On October 9, 2003, CCC and Mr. Bokemeier executed the First Amendment to the Operating Agreement (the "**First Amendment**"), revising Section 3.4 and admitting WFC as "Special Managing Member." A copy of the First Amendment is attached hereto as **Exhibit 4**.

47.     The First Amendment specifically provides that "[i]n all other respects, the Operating Agreement shall remain in full force and effect." Ex. 4, § 2.

48.     Although the attached Exhibit 4 is not the fully executed copy of the First Amendment, Mr. Wood, on behalf of WFC, did sign the acknowledgement at the bottom of the

First Amendment which states, "[a]dmission as Special Managing Member and the terms and conditions of the Operating Agreement are hereby accepted."

49.     The First Amendment specifically sets forth the duties of WFC in Exhibit I thereto. Ex. 4, Ex. I thereto.

50.     Among other things, Exhibit I to the First Amendment expressly states: "6. All decisions regarding the development of the property, including but not limited to, number of lots, engineering contracts, etc. shall be made jointly by the Manager and the Special Managing Member." *Id*.

51.     Among other things, the Exhibit I to the First Amendment contemplates that WFC would be tasked with securing funding "*up to a total of $2,500,000*," and that WFC "shall not be responsible for arranging any other capital investment in [MCE]." *Id.* (emphasis added).

52.     On October 21, 2003, consistent with the language of the First Amendment, CCC and Mr. Bokemeier held a special meeting of the members of MCE and authorized MCE to borrow up to $2,500,000.00. A copy of the minutes from the October 21, 2003 special meeting is attached hereto as **Exhibit 5.**

53.     At the October 21, 2003 special meeting, there was no discussion about MCE borrowing the funds from Mr. Wood or Mr. McCracken, or any of their companies or affiliates.

### C.  MCE Funding, the 2003 Note, and the 2003 DOT

54.     Upon information and belief, on November 6, 2003, Mr. McCracken arranged for the formation of MCE Funding. The Registration Statement and Annual Report for MCE Funding are attached hereto as **Exhibit 6**.

55.     Plaintiff has now learned that Mr. McCracken has an ownership and/or material financial interest in MCE Funding.

56.     Mr. McCracken has signed at least two Request for Release of Deed of Trust documents on behalf of MCE Funding. Such Requests are attached hereto as **Exhibit 7** and **Exhibit 8**.

57.     Mr. McCracken is listed as the registered agent for MCE Funding. Ex. 6.

58.     Upon information and belief, Mr. Wood is also a member of and/or has a material financial interest in MCE Funding.

59.     At the time MCE Funding was formed, Mr. McCracken and Mr. Wood were also shareholders and principals of WFC, the newly admitted Special Managing Member of MCE.

60.     Upon information and belief, and unbeknownst to MCE or the members of MCE at the time, MCE Funding did not have any assets of its own at the time it was formed in November 2003.

61.     Upon information and belief, MCE Funding was a mere shell that Mr. McCracken, Mr. Wood, and the Whitehall Entities used to obligate MCE in various undisclosed loan agreements on terms favorable to Mr. McCracken, Mr. Wood and/or the entities in which they had an ownership or other material financial interest. Said conduct was to the benefit of Mr. McCracken, Mr. Wood, and the Whitehall Entities and to the detriment of MCE.

62.     On November 12, 2003 MCE, through CCC and at the direction of WFC, executed a promissory note to borrow up to $2,500,000.00 from MCE Funding (the "**2003 Note**"), attached hereto as **Exhibit 9**.

63.     The 2003 Note provided that MCE Funding would lend MCE a principal sum of up to $2,500,000.00 (the "**2003 Note Principal**"). Ex. 9.

64.     The 2003 Note required MCE to repay the 2003 Note Principal in one lump sum payment, together with annual interest at a rate of 18% per annum and late fees for any late payment.  *Id*.

65.     The 2003 Note provided that the note would mature on November 1, 2007. *Id*.

66.     The 2003 Note has never been extended, revived, amended, and/or reaffirmed by MCE at any time relevant.

67.     The 2003 Note provides that it is secured by a deed of trust encumbering the Land. *Id*.

68.     On November 12, 2003, MCE, through CCC and at the direction of WFC, executed a deed of trust encumbering the Land in favor of MCE Funding ("**2003 DOT**"), a copy of which is attached hereto as **Exhibit 10**.

69.     At no time prior to the signing of either the 2003 Note or the 2003 DOT did WFC, Mr. McCracken, or Mr. Wood ever disclose their ownership and/or material financial interest in MCE Funding to MCE or any of its members or their principals.

70.     Neither MCE nor its members had any reason to know about WFC, Mr. McCracken, and/or Mr. Wood's interest(s) in MCE Funding prior to executing the 2003 Note or 2003 DOT.

71.     Knowledge regarding WFC, Mr. McCracken, and/or Mr. Wood's ownership or other material financial interest(s) in MCE Funding would have been material to MCE and its

members' evaluation of the transaction encompassed by the 2003 Note and 2003 DOT for at least the following reasons:

    a. MCE Funding was identified as the lender under the 2003 Note and stood to recoup a significant sum of 18% annual interest, as well as late fees, from MCE under the 2003 Note.

    b. WFC, as Special Managing Member of MCE, and Mr. McCracken and/or Mr. Wood as the principals of WFC, were in a unique position to control whether and how the debt to MCE Funding was repaid.

    c. WFC, as Special Managing Member of MCE, and Mr. McCracken and/or Mr. Wood as the principals of WFC, had access to and control over all accounts and records belonging to MCE.

    d. MCE Funding was identified as the beneficiary under a Deed of Trust encumbering the Land.

    e. WFC was hired as Special Managing Member to assist with the development of the Project, and would have had significant control over the finances of the Project.

    f. Specifically, Mr. McCracken and/or Mr. Wood would have been in a position to review, approve, and sign off on any payoff requests in escrow for any closing on the Project, including payoff requests from MCE Funding.

72. The circumstances described in preceding Paragraph 71, including subparts (a) through (f), created an inherent conflict of interest wherein Mr. McCracken and/or Mr. Wood,

the principals and owners of WFC, would inevitably be in a position where they would not or could act in MCE's best interests.

73.     The circumstances described in preceding Paragraph 71 including subparts (a) through (f), actually incentivized WFC, Mr. McCracken, and Mr. Wood to take actions to the detriment of MCE that would benefit MCE Funding, the Whitehall Entities, Mr. McCracken, Mr. Wood, and Coscan.

74.     Both the 2003 Note and the 2003 DOT required approval by the members of MCE under the Operating Agreement for reasons including, but not limited to, those described above.

75.     Neither MCE nor its members ever approved the self-dealing transactions encompassed by the 2003 Note and 2003 DOT.

76.     MCE and its members were also not fully informed of material information regarding the self-dealing transactions encompassed by the 2003 Note and the 2003 DOT.

77.     Upon information and belief, and unbeknownst to MCE or its members at the time, MCE Funding did not actually supply the 2003 Note Principal to MCE.

78.     Instead, MCE Funding used the 2003 Note in order to fraudulently obtain MCE's signature on the 2003 Deed of Trust, thereby granting MCE Funding a security interest in the Land that MCE Funding would later use to steal the sale proceeds from various phases of the Project, as set forth in more detail below.

***D. Other background events between 2003 and 2018***

79.     On December 8, 2003, CCC, Mr. Bokemeier, WFC, G & G, and WFLLC executed a Second Amendment to the Operating Agreement ("**Second Amendment**"), a copy of which is attached hereto as **Exhibit 11**.

80.     The Second Amendment transferred all of CCC's rights and interests in MCE to G & G.

81.     The Second Amendment also transferred all of WFC's rights and interests to WFLLC.

82.     Upon information and belief, Mr. McCracken and Mr. Wood were at the time of executing the Second Amendment, and are now, members and managers of WFLLC.

83.     Later, in an Amendment to the Operating Agreement dated January 30, 2004, Mr. Bokemeier's ownership interest in MCE was adjusted to be 17.63% ownership in his capacity as the Trustee of the Frances Chase Bokemeier Trust A and 32.37% ownership in his capacity as the Trustee of the Frances Chase Bokemeier Trust B, still totaling 50% ownership. This Amendment is attached hereto as **Exhibit 35**.

84.     After the formation of MCE in 2003, the development of the Land was stagnant for approximately a decade due to economic conditions.

85.     Between 2003 and 2021, Mr. Kristjansson, the principal for G&G, which was and is the elected Manager of MCE, was located in California.

86.     Accordingly, the members of MCE contemplated and presumed that the Whitehall Entities would continue to assist in good faith with the Project locally.

87.     Because of this, the Whitehall Entities, Mr. McCracken and Mr. Wood had access to and control over the financial accounts and records of MCE while development of the Project was ongoing.

88.     Further, the Whitehall Entities, Mr. McCracken and Mr. Wood had possession of all records and correspondence pertaining to the Project.

89.     On June 24, 2014, Mr. McCracken asked the members of MCE to hold a special meeting to discuss and agree to the continuing authority of the Special Managing Member, WFLLC, to sign documents regarding the Land. The Minutes from the June 24, 2014 meeting are attached hereto as **Exhibit 12**.

90.     At the June 24, 2014 meeting, MCE gave WFLLC authority to sign specific documents on behalf of MCE, but there was no discussion about eliminating or amending the provision from the First Amendment that "[a]ll decisions regarding the development of [the Land]… shall be made jointly by the Manager and the Special Managing Member."

91.     Nothing about the June 24, 2014 meeting provided WFLLC the authority to take actions on behalf of MCE without the approval of, at minimum, MCE's manager and member, G & G.

92.     Nothing about the June 24, 2014 meeting provided WFLLC absolute discretion in managing the affairs of MCE.

93.     Nothing about the June 24, 2014 meeting provided WFLLC the authority to borrow money on behalf of MCE in excess of the previously authorized cap of $2,500,000.00.

94.     Nothing about the June 14, 2014 meeting purported to amend the Operating Agreement (Exhibit 1) to remove the requirement of Section 5.3 B(I) that a manager must obtain

the affirmative vote or written consent of the majority interest of the members of MCE prior to "the sale, exchange, or other disposition" of the Land.

95.     Mr. McCracken, as an individual, was never appointed as Special Managing Member of MCE, nor was any membership interest in MCE ever transferred to Mr. McCracken.

96.     Mr. Wood, as an individual, was never appointed as Special Managing Member of MCE, nor was any membership interest in MCE ever transferred to Mr. Wood.

97.     On October 23, 2014, Mr. McCracken converted the form of MCE Funding to a Colorado limited liability company. The Statement of Conversion is attached hereto as **Exhibit 13.**

98.     Upon information and belief, Defendants' ownership or material financial interest(s) in MCE Funding continued to exist after MCE Funding was converted to an LLC.

**E.  Unauthorized Conveyance and Lease of Mineral Rights**

99.     Upon information and belief, on January 14, 2011, Mr. McCracken caused Defendant Homestead to be formed. Attached hereto as **Exhibit 29** are the Articles of Organization for Homestead filed with the Colorado Secretary of State on that same date.

100.     Homestead's Articles of Organization list Mr. McCracken as the individual causing the document to be filed, list Mr. McCracken as the registered agent, and list a mailing address and principal office address that is the same as Mr. McCracken's address. Ex. 29.

101.     Upon information and belief, since its formation on January 14, 2011, Mr. McCracken had and has continued to have an ownership and/or material financial interest in Homestead.

102.    **Exhibit 30** attached hereto is the 2021 annual filing for Homestead, which contains all of Mr. McCracken's same information as the Articles of Organization in Exhibit 29.

103.    On March 14, 2011, without due authorization, disclosure, or approval, Mr. McCracken caused the mineral rights underlying the Land (the "**Mineral Rights**"), rightfully belonging to MCE, to be conveyed to Homestead. Attached hereto as **Exhibit 31** is the Special Warranty Deed depicting this conveyance.

104.    Mr. McCracken did not obtain required approval from Mr. Bokemeier or G & G to convey the Mineral rights to Homestead.

105.    To date, Mr. McCracken has never disclosed the conveyance depicted in Exhibit 31 to Plaintiff or its members, nor has Mr. McCracken disclosed his ownership and/or material financial interest in Homestead.

106.    Upon information and belief, Mr. McCracken caused the Mineral Rights to be conveyed from MCE to Homestead without paying MCE any consideration for same.

107.    The Special Warranty Deed in Exhibit 31 is signed by Mr. McCracken, in his individual capacity, on behalf of MCE, even though Mr. McCracken lacked any authority to make such conveyance.

108.    Upon information and belief, Mr. McCracken signed the Special Warranty Deed in Exhibit 31 himself, rather than requesting that G & G through Mr. Kristjansson do so, in order to conceal this transaction from the members of MCE.

109.    Mr. McCracken did not have the authority to sign the Special Warranty Deed in Exhibit 31 on behalf of MCE.

110.     On June 25, 2014, just one day after the special meeting of MCE memorialized by the Minutes in Exhibit 12, Mr. McCracken executed a Quit Claim Deed on behalf of MCE to once again convey the Mineral Rights to Homestead, effective as of March 14, 2011. A copy of the Quit Claim Deed is attached hereto as **Exhibit 32**.

111.     There was no discussion of conveying the Mineral Rights at the June 24, 2014 meeting.

112.     Mr. McCracken did not obtain required approval or authorization from the members of MCE to execute the Quit Claim Deed in Exhibit 32.

113.     At the June 24, 2014 meeting, Mr. McCracken never disclosed that he had already executed the Special Warranty Deed in Exhibit 31 in favor of Homestead.

114.     At the June 14, 2014 meeting, Mr. McCracken did not disclose his ownership or material financial interest in Homestead.

115.     Upon information and belief, Mr. McCracken requested the special meeting on June 24, 2014 under false pretenses: Mr. McCracken led G & G and Mr. Bokemeier to believe that WFLLC needed authority to sign documents related to early stages of the development of the Project, but Mr. McCracken instead used his authority to bind MCE in unauthorized and undisclosed transactions without the knowledge or approval of its members.

116.     Upon information and belief, Mr. McCracken exploited the limited authority given to the Special Managing Member of MCE for his own personal benefit.

117.     Following the June 25, 2014 conveyance depicted in Exhibit 32, Mr. McCracken then caused Homestead to lease the Mineral Rights, rightfully belonging to MCE, to Hiline

Resources, LLC ("**Hiline**"). A copy of the lease between Homestead and Hiline is attached

hereto as **Exhibit 33** ("**Hiline Lease**").

118.    Upon information and belief, Homestead, and thus Mr. McCracken, received an

undisclosed financial benefit under the Hiline Lease in an amount greater than the consideration

depicted on the face of the Hiline Lease.

119.    MCE did not receive any compensation from the Hiline Lease.

120.    Neither Mr. McCracken, nor any other Defendant, ever disclosed the Hiline Lease

to G & G or Mr. Bokemeier.

121.    The term of the Hiline Lease was four years from March 31, 2016. Ex. 33.

122.    Upon information and belief, sometime after the term of the Hiline Lease ended,

but prior to September 15, 2020, Mr. McCracken caused the Mineral Rights, rightfully belonging

to MCE, to be conveyed by Homestead to Crestone Peak Resources Holdings LLC ("**CPRH**").

123.    On September 15, 2020, CPRH filed a Request for Notification of Surface

Development with the Arapahoe County Clerk and Recorder's Office, indicating that CPRH is

the "Mineral Estate Owner." A Copy of the Request for Notification of Surface Development

filed by CPRH is attached hereto as **Exhibit 34**.

124.    MCE and its members have never been provided, and have been unable to locate

any public record of, the conveyance of the Mineral Rights from Homestead to CPRH.

125.    Neither Mr. McCracken nor any other Defendant has ever notified G & G or Mr.

Bokemeier of the conveyance of the Mineral rights to CPRH.

126.    Upon information and belief, Homestead, and thus Mr. McCracken, received

consideration in exchange for the conveyance of the Mineral Rights to CPRH.

127.   MCE has not received any consideration from any sale of the Mineral rights underlying the Land.

128.   Upon information and belief, Mr. McCracken, through Homestead, took the proceeds from each of the transactions involving the Mineral Rights, rightfully belonging to MCE, and used such proceeds for his own personal benefit.

### F. Unauthorized Loans

129.   From approximately November 2003 to present, the Whitehall Entities, Mr. McCracken, and Mr. Wood provided only select and limited information and documentation to the members of MCE.

130.   Upon information and belief, the Whitehall Entities, Mr. McCracken, and Mr. Wood intentionally withheld from MCE and its members all financial information and documentation pertaining to the financial condition of MCE.

131.   Upon information and belief, the Whitehall Entities, Mr. McCracken, and Mr. Wood used their access and control over MCE to obligate MCE to unauthorized transactions, steal from MCE to repay debts of entities in which Defendants had/have a material financial interest, and execute fraudulent documents on behalf of MCE, all while concealing the same from MCE's members.

132.   Despite repeated requests, neither MCE nor G & G have ever been provided any documentation of any loan agreement entered into on MCE's behalf by any Defendant.

133.   Upon information and belief, sometime between 2003 and 2018, and unbeknownst to MCE, its member(s), or their predecessors, Defendants Mr. McCracken, Mr. Wood, and/or the Whitehall Entities caused MCE to enter loan agreements with at least the

following individuals: Tom Clyde, Lawrence Wellman, Barbara Aanonson, and Kathy McCracken.

134.     Upon information and belief, Kathy McCracken is the wife of Mr. McCracken.

135.     Prior to causing MCE to enter any agreement with Kathy McCracken, neither Mr. McCracken, Mr. Wood, nor the Whitehall Entities ever disclosed such agreement or Mr. McCracken's personal relationship and resulting financial interest in the loan proceeds.

136.     MCE does not know the extent of any relationship between Tom Clyde, Lawrence Wellman, and Barbara Aanonson and any of the Defendants named herein.

137.     MCE has requested information regarding any loan agreements with Tom Clyde, Lawrence Wellman, and Barbara Aanonson from Defendants on multiple occasions between April 5, 2021 and the filing of this Complaint, and Defendants have refused to provide MCE with such documentation or information.

138.     Upon information and belief, sometime between 2003 and 2018, Defendants Mr. McCracken, Mr. Wood, the Whitehall Entities, and/or MCE Funding caused MCE to enter loan agreements with at least the following entities: Coscan and Duane M. Freund, LLC.

139.     Upon information and belief, Mr. McCracken and Mr. Wood are now, and were at all times relevant to this Action, owners and principals of Coscan, a fact that was never previously disclosed to MCE until at a hearing held on October 11, 2021, Mr. McCracken testified that both Mr. McCracken and Mr. Wood were the sole shareholders of Coscan.

140.     Additionally, the Nevada Secretary of State website lists Mr. Wood as the President, Director, Treasurer, and Secretary of Coscan.

141.    At no time prior to October 11, 2021, did Mr. McCracken, Mr. Wood, the Whitehall Entities, or MCE Funding ever disclose their ownership or other material financial interest in Coscan.

142.    Plaintiff, through its current sole member G & G, has requested information from Defendants regarding any loan made to MCE by Coscan on multiple occasions between April 5, 2021 and the filing of this Complaint, and Defendants have refused to provide Plaintiff with the requested information, with the exception of a single excel file that purports to be a balance owed to Coscan. *See* Ex. 27.

143.    In September 2021, MCE and G & G learned that on February 23, 2016, without due authorization, disclosure or approval, Mr. McCracken, purporting to act on behalf of MCE, executed a Deed of Trust ("**2016 DOT**") in favor of Duane M. Freund, LLC, against the Land to secure a note on the amount of $512,101.00 ("**2016 Note**").

144.    Neither Mr. McCracken, Mr. Wood, nor WFLLC disclosed the existence of the 2016 Note until September 2021, when Mr. McCracken filed a copy of the Deed of Trust securing the 2016 Note in connection with a spurious lien hearing previously held pursuant to Colo. R. Civ. P. 105.1.

145.    The 2016 DOT is attached hereto as **Exhibit 14**.

146.    Plaintiff is unable to attach the 2016 Note because, despite repeated demands, Defendants have refused to produce a copy of the 2016 Note or any other documentation relating to the 2016 Note.

147.    Upon information and belief, Mr. McCracken had, and may continue to have, an undisclosed material financial interest in the proceeds of the 2016 Note.

### G. 2018 Lennar Sale 1

148.    On June 25, 2018, without due authorization, disclosure or approval, Mr. McCracken entered a contract with Lennar Colorado LLC ("**Lennar**") to sell a portion of the Land for $6,426,500.00 (the "**Lennar Sale 1**"). The Memorandum of Agreement with respect to the Lennar Sale 1 is attached here as **Exhibit 15**.

149.    MCE does not have in its possession, and Defendants have refused to provide, any other documentation regarding the purchase contract for Lennar Sale 1.

150.    MCE did not have any meeting to discuss any sale of the Project in 2018.

151.    Specifically, MCE did not have any meeting to discuss Lennar Sale 1 in 2018.

152.    The majority members of MCE at all times in 2018 were Mr. Bokemeier and G & G.

153.    Neither Mr. Bokemeier nor G & G gave an affirmative vote or written consent to Lennar Sale 1.

154.    On August 17, 2018, without due authorization, disclosure or approval, Mr. McCracken closed escrow on Lennar Sale 1.

155.    Heritage Title Company served as the closing agent for Lennar Sale 1.

156.    It is common practice in real estate transactions for sale proceeds to be wired electronically as part of the closing process.  Seller proceeds and loan payoffs in this transaction, as is custom, were wired to the intended recipients.

157.    A copy of MCE's Seller's Settlement Statement from Lennar Sale 1, signed by Mr. McCracken, is attached hereto as **Exhibit 16**.

158.    Prior to closing that transaction, on August 9, 2018, Mr. McCracken executed a statement of authority on behalf of Murphy Creek Estates identifying himself, individually, as a manager of MCE with authority to execute instruments conveying, encumbering, or otherwise affecting title to real property on behalf of MCE. A copy of this Statement of Authority executed by Mr. McCracken is attached hereto as **Exhibit 17**.

159.    The Statement of Authority in Exhibit 17 is false; Mr. McCracken, as an individual, has never been a manager of MCE nor been given authority to sign documents on behalf of MCE.

160.    As part of the August 17, 2018 Lennar Sale 1, as shown in Exhibit 16, sale proceeds of $424,872.68 were paid to "Tom Clyde, Lawrence Wellman and Barbara Aanonson paydown."

161.    Neither Mr. Bokemeier nor G & G approved the payoff to Tom Clyde, Lawrence Wellman, or Barbara Aanonson shown in Exhibit 16.

162.    Mr. McCracken, purporting to act on behalf of MCE, approved the payoff to Tom Clyde, Lawrence Wellman and Barbara Aanonson in Exhibit 16 despite the fact that neither Mr. Bokemeier, nor G & G ever gave an affirmative vote or written consent, as required under the Operating Agreement, for any loan from Tom Clyde, Lawrence Wellman, or Barbara Aanonson.

163.    As part of the August 17, 2018 Lennar Sale 1, as shown in Exhibit 16, sale proceeds of $512,101.00 were paid to Duane M. Freund, LLC.

164.    Neither Mr. Bokemeier nor G & G approved the payoff to Duane M. Freund, LLC shown in Exhibit 16.

165.     Mr. McCracken, purporting to act on behalf of MCE, approved the payoff to Duane M. Freund, LLC in Exhibit 16 despite the fact that neither Mr. Bokemeier, nor G & G ever gave an affirmative vote or written consent, as required under the Operating Agreement, for any loan from Duane M. Freund, LLC.

166.     As part of the August 17, 2018 Lennar Sale 1, as shown in Exhibit 16, sale proceeds of $3,345,739.62 were paid to Coscan Commercial.

167.     Upon information and belief, the payoff on Exhibit 16 to Coscan Commercial was a payment to Defendant Coscan.

168.     Neither Mr. Bokemeier nor G & G approved the payoff to Coscan shown in Exhibit 16.

169.     Mr. McCracken, purporting to act on behalf of MCE, approved the payoff to Coscan in Exhibit 16 despite the fact that neither Mr. Bokemeier, nor G & G ever gave an affirmative vote or written consent, as required under the Operating Agreement, for any loan from Coscan.

170.     Upon information and belief, MCE Funding, Mr. McCracken, and/or Mr. Wood provided Heritage Title with wiring instructions for the sale proceeds from Lennar Sale 1.

171.     Upon information and belief, MCE Funding, Mr. McCracken, and/or Mr. Wood instructed Heritage Title Company, who performed the closing of Lennar Sale 1 in Colorado, to wire sale proceeds of $3,345,739.62 to Coscan in Nevada.

172.     MCE did not receive a single cent from the nearly $6.5 million dollar purchase price from the Lennar Sale 1.

173.    MCE and its members were not provided the Sellers Settlement Statement in Exhibit 16 from any Defendant until approximately April 5, 2021. This is the first date that MCE and its members learned of this fact.

### H. 2021 Lennar Sale 2

174.    On March 23, 2021, without due authorization, disclosure or approval, Mr. McCracken entered a Bill of Sale and Assignment with Lennar to sell a portion of the Land for $5,317,515.00 (the "**Lennar Sale 2**").

175.    Mr. McCracken's actions in concealing documents and transactions from MCE and its members, as discussed in more detail in Section I below, resulted in MCE and/or its members' inability to discover Defendants' fraud before the closing of Lennar Sale 2.

176.    Lennar Sale 2 was in violation of Section 5.3 B (I) of the MCE Operating Agreement. *See* Ex. 1.

177.    MCE did not have any meeting to discuss any sale of the Project in 2021, including Lennar Sale 2.

178.    The majority members of MCE in 2021, prior to the closing of Lennar Sale 2 on March 23, 2021, were G & G and Mr. Bokemeier.

179.    The majority members of MCE did not give, as required, an affirmative vote or written consent to Lennar Sale 2.

180.    Heritage Title Company served as the closing agent for Lennar Sale 2.

181.    Mr. McCracken signed the closing documents for the March 23, 2021 Lennar Sale 2, including MCE's Sellers Settlement Statement attached hereto as **Exhibit 20**.

182.    As part of the Lennar Sale 2, as shown in Exhibit 20, sale proceeds of $1,574,917.65 were paid to "Tom Clyde, Lawrence Wellman and Barbara Aanonson."

183.    Neither Mr. Bokemeier nor G & G approved the payoff to Tom Clyde, Lawrence Wellman and Barbara Aanonson shown in Exhibit 20.

184.    Mr. McCracken, purporting to act on behalf of MCE, approved the payoff to Tom Clyde, Lawrence Wellman and Barbara Aanonson in Exhibit 20 despite the fact that neither Mr. Bokemeier, nor G & G ever gave an affirmative vote or written consent, as required under the Operating Agreement, for any loan from Tom Clyde, Lawrence Wellman and Barbara Aanonson.

185.    As part of Lennar Sale 2, as shown in Exhibit 20, sale proceeds of $3,594,322.33 were paid to "Coscan Commercial."

186.    Upon information and belief, the payoff on Exhibit 20 to Coscan Commercial was a payment directly to Defendant Coscan.

187.    Neither Mr. Bokemeier nor G & G approved the payoff to Coscan shown in Exhibit 20.

188.    Mr. McCracken, purporting to act on behalf of MCE, approved the payoff to Coscan in Exhibit 20 despite the fact that neither Mr. Bokemeier, nor G & G ever gave an affirmative vote or written consent, as required under the Operating Agreement, for any loan from Coscan.

189.    Upon information and belief, MCE Funding, Mr. McCracken, and/or Mr. Wood provided Heritage Title with wiring instructions for the sale proceeds from Lennar Sale 2.

190.    Upon information and belief, MCE Funding, Mr. McCracken, and/or Mr. Wood instructed Heritage Title Company, who performed the closing of Lennar Sale 2 in Colorado, to wire sale proceeds of $3,594,322.33 to Coscan in Nevada.

191.    MCE did not receive a single cent from the nearly $5.5 million dollar purchase price from Lennar Sale 2.

192.    MCE and its members were not provided with MCE's Sellers Settlement Statement in Exhibit 20 until after closing on approximately April 5, 2021.  This was the first MCE learned of this fact.

*I. Defendants' Concealment in furtherance of Fraud*

193.    Defendants took steps to conceal their actions from the members of MCE.

194.    In addition to the unauthorized actions taken by Defendants as described in the preceding paragraphs, Mr. McCracken and/or Mr. Wood have forged Mr. Kristjansson's signature on at least two separate occasions.

195.    On both occasions that Mr. McCracken and/or Mr. Wood forged Mr. Kristjansson's signature, it was to effect self-dealing transactions between MCE and entities that Mr. McCracken and/or Mr. Wood had an ownership or other material financial interest in.

196.    Upon information and belief, Mr. McCracken and/or Mr. Wood did not use their own signature(s) to effect such self-dealing transactions because Mr. McCracken and/or Mr. Wood wanted to lessen the appearance of a conflict of interest.

197.    Prior to August 17, 2018, the date of the Lennar Sale 1, G & G and Mr. Bokemeier were under the impression that MCE no longer owed any principal amount under the 2003 Note.

198.   The 2003 Note was due on November 1, 2007, and any modification to the 2003 Note required affirmative vote or written consent of the majority members of MCE pursuant to the Operating Agreement.

199.   Neither G & G nor Mr. Bokemeier ever approved or signed any modification to the 2003 Note.

200.   Nonetheless, MCE and G & G were recently made aware of at least one document, authored and created by Mr. Wood, purporting to be a formal request from MCE to modify the 2003 Note and borrow an additional $1,000,000.00 from MCE Funding, dated May 4, 2021 (the "**Forged Modification**"). The Forged Modification is attached hereto as **Exhibit 18**.

201.   While Mr. Kristjansson did not author or sign the Forged Modification attached in Exhibit 18, he did author and sign a letter to MCE Funding dated May 4th, 2021, and attached hereto as **Exhibit 36** ("**May 4th Letter**").

202.   The May 4th Letter relates to a Bokemeier Option Agreement dated 12/27/2018 wherein Mr. Bokemeier granted MCE the option to purchase Mr. Bokemeier's interests in MCE for $1,000,000.00 within 3 years. A copy of the Bokemeier Option Agreement is attached hereto as **Exhibit 37**.

203.   Through the May 4th Letter, G & G sought to recover $1,150,000.00 in sale proceeds rightfully belonging to MCE that were in the possession and control of Defendants following the Lennar Sale 1 and Lennar Sale 2.

204.   G & G did not learn that the sale proceeds rightfully belonging to MCE were in the possession and control of Defendants until April 5, 2021, because Defendants concealed the Lennar Sale 1 and Lennar Sale 2 from MCE's members until April 5, 2021.

205.    The Forged Modification is a document fabricated by Defendants that directly contradicts the May 4th Letter to the detriment of MCE.

206.    The Forged Modification purports to contain the signature of Mr. Kristjansson as manager of MCE.

207.    Upon information and belief, the Forged Modification was authored by Mr. Wood.

208.    The purported signature of Mr. Kristjansson on the Forged Modification is a typewritten cursive font.

209.    Upon information and belief, Mr. Wood typed Mr. Kristjansson's forged signature on the Forged Modification.

210.    Mr. Kristjansson did not sign the Forged Modification himself or duly authorize anyone to sign the Forged Modification on his behalf.

211.    Further, G & G, not Mr. Kristjansson, was the manager of G & G on the date the Forged Modification purports to have been signed.

212.    Mr. Kristjansson always signs documents related to MCE in his capacity as president of G & G, or its predecessor CCC.

213.    MCE Funding did not loan an additional $1,000,000.00 to MCE on or about May 4, 2021, as indicated by the Modification.

214.    Conversely, the May 4th Letter was actually authored by Mr. Kristjansson and contains Mr. Kristjansson's real handwritten signature.

215.    The May 4th Letter is signed by Mr. Kristjansson in his capacity as president of G & G Consulting. Inc., manager of MCE.

216.    The May 4th Letter explicitly states that the 2003 Note is expired.

217.    The May 4th Letter explicitly states that it is not a modification of the 2003 Note.

218.    The May 4th Letter requests that MCE Funding provide sale proceeds from Lennar Sale 1 and Lennar Sale 2, rightfully belonging to MCE, so that MCE can exercise its option under Exhibit 37.

219.    Upon information and belief, Coscan, at the direction of Mr. McCracken and/or Mr. Wood, did return a portion of the sale proceeds from Lennar Sale 1 and Lennar Sale 2 to MCE after MCE Funding received the May 4th Letter.

220.    Thereafter, MCE exercised its option under the agreement in Exhibit 37 and purchased Mr. Bokemeier's interest, leaving G & G as the sole present member of MCE.

221.    Upon information and belief, the Forged Modification is a fraudulent document intended to artificially inflate the balance Defendants claim is owed by MCE to MCE Funding under the 2003 Note.

222.    Similarly, MCE and G & G were recently made aware of a certain Deed of Trust in favor of MCE Funding that was purportedly executed on November 12, 2003, but not recorded until July 8, 2019 at Reception No. D9066077 in the records of the Arapahoe County Clerk and Recorder's Office ("**2019 DOT**"). The 2019 DOT is attached hereto as **Exhibit 19**.

223.    The 2019 DOT also purports to contain Mr. Kristjansson's signature.

224.    Mr. Kristjansson's signature on the 2019 DOT was forged by Mr. McCracken.

225.    Mr. McCracken removed the signature page from the 2003 DOT, which Mr. Kristjansson signed in 2003, and attached it to the 2019 DOT.

226.     Mr. McCracken then caused the 2019 DOT to be recorded, without authorization or approval from the members of MCE, as a lien encumbering the Land in favor of Mr. McCracken's entity, MCE Funding.

227.     MCE and G & G, and Mr. Kristjansson as principal for G & G, were not aware of the 2019 DOT until approximately late summer/early fall 2021.

228.     Mr. Kristjansson had no knowledge of the 2019 DOT prior to approximately late summer/early fall 2021.

229.     Regarding the 2019 DOT, Mr. Kristjansson never gave Mr. McCracken, or any other Defendant, permission to use his signature in that manner.

230.     Neither MCE nor its members gave Mr. McCracken specific authority to execute the 2019 DOT on behalf of MCE.

231.     Absent the explicit and specific authorization and approval of the members of MCE, provided for in the Operating Agreement, Mr. McCracken could not have signed the 2019 DOT himself because the 2019 DOT was in favor of MCE Funding, an entity in which Mr. McCracken has an ownership or other material financial interest.

232.     Upon information and belief, Mr. McCracken deliberately chose to forge Mr. Kristjansson's signature to avoid disclosing and obtaining approval for the self-serving transactions that Mr. McCracken had caused to occur between MCE and other entities in which Mr. McCracken and Mr. Wood had, and continue to have, material financial interests.

233.     Upon information and belief, Mr. McCracken deliberately chose to forge Mr. Kristjansson's signature, rather than ask Mr. Kristjansson for his signature, in an effort to further conceal the fraud that Defendants were perpetrating on Plaintiff.

### J. *Unaccounted for Payoffs from Escrow to Date*

234.    From both Lennar Sale 1 and Lennar Sale 2, Tom Clyde, Lawrence Wellman, and Barbara Aanonson were collectively paid approximately $1,999,790.33.

235.    Neither MCE, its members, nor any of their agents or representatives, ever authorized Mr. McCracken, Mr. Wood, the Whitehall Entities, or MCE Funding to obtain any loan on behalf of MCE from Tom Clyde, Lawrence Wellman and/or Barbara Aanonson.

236.    Despite repeated demands, Mr. McCracken, Mr. Wood, the Whitehall Entities, and/or MCE Funding each refuse to provide any documentation regarding any loan to MCE from Tom Clyde, Lawrence Wellman and/or Barbara Aanonson.

237.    In the current circumstances, MCE has not even been provided basic information such as the principal amount of any loan to MCE by Tom Clyde, Lawrence Wellman and/or Barbara Aanonson, or any of the terms of such loan(s).

238.    Upon information and belief, no such loan agreement(s) exist(s) obligating MCE to repay any loan to Tom Clyde, Lawrence Wellman, and/or Barbara Aanonson.

239.    Upon information and belief, any loan from Tom Clyde, Lawrence Wellman, and/or Barbara Aanonson was made directly to Mr. McCracken, Mr. Wood, the Whitehall Entities, and/or MCE Funding, and not to MCE.

240.    From Lennar Sale 1, Duane M. Freund, LLC was paid a total of $512,101.00.

241.    Neither MCE, its members, nor any of their agents or representatives, ever authorized Mr. McCracken, Mr. Wood, the Whitehall Entities, or MCE Funding to obtain any loan on behalf of MCE from Duane M. Freund, LLC.

242.    Despite repeated demands, Mr. McCracken, Mr. Wood, the Whitehall Entities, and/or MCE Funding each refuse to provide any documentation regarding any loan to MCE from Duane M. Freund, LLC.

243.    In the current circumstances, MCE has not even been provided basic information such as the principal amount of any loan to MCE by Duane M. Freund, LLC, or any of the terms of such a loan.

244.    Upon information and belief, no such loan agreement(s) exist(s) obligating MCE to repay any loan to Duane M. Freund, LLC.

245.    Upon information and belief, any loan from Duane M. Freund, LLC was made directly to Mr. McCracken, Mr. Wood, the Whitehall Entities, and/or MCE Funding, and not to MCE.

246.    From both Lennar Sale 1 and Lennar Sale 2, Coscan has been paid a total of $6,940,061.95.

247.    Neither MCE, its members, nor any of their agents or representatives, ever authorized Mr. McCracken, Mr. Wood, the Whitehall Entities, or MCE Funding to obtain any loan on behalf of MCE from Coscan.

248.    Despite repeated demands, Mr. McCracken, Mr. Wood, the Whitehall Entities, and/or MCE Funding each refuse to provide any documentation regarding any loan to MCE from Coscan.

249.    In the current circumstances, MCE has not even been provided basic information such as the principal amount of any loan to MCE by Coscan, or any of the terms of such a loan.

250.     Upon information and belief, no such loan agreement(s) exist(s) obligating MCE to repay any loan to Coscan.

251.     Upon information and belief, Defendants Mr. McCracken and Mr. Wood are using payoffs to Coscan, a Nevada Corporation wholly owned and controlled by Mr. McCracken and Mr. Wood, to steal sale proceeds from the Project belonging to MCE.

252.     In sum, Defendants have either refused, or are unable, to account for approximately $9,451,953.28 in sale proceeds, or over eighty percent (80%) of the cumulative purchase price paid for Lennar Sale 1 and Lennar Sale 2.

253.     Over half of all sale proceeds from the Project to date have gone directly to Coscan, an entity owned and controlled by Mr. McCracken and Mr. Wood.

### K. Plaintiff's Investigation beginning April 5, 2021

254.     G & G, through its principal Mr. Kristjansson, discovered these actions by Defendants upon receipt of the 2018 Lennar Sale 1 Sellers Settlement Statement (Ex. 16) and the 2021 Lennar Sale 2 Sellers Settlement Statement (Ex. 20) for the very first time on April 5, 2021.

255.     G & G, through Mr. Kristjansson, promptly took action on behalf of MCE to obtain the relevant financial documentation underlying the payoffs to Duane M. Freund, LLC, Tom Clyde, Lawrence Wellman, Barbara Aanonson, and/or Coscan as shown in Exhibits 16 and 20.

256.     Plaintiff, through counsel, sent written requests to Defendants Mr. McCracken and Mr. Wood requesting production of such financial information underlying the payoffs to Duane M. Freund, LLC, Tom Clyde, Lawrence Wellman, Barbara Aanonson, and/or Coscan as

shown on Exhibits 16 and 20. A copy of G & G's requests, made on behalf of MCE. are included herein as **Exhibit 21**.

257.    In response, Defendants provided a document purporting to be a general ledger for MCE in April 2021 (the "**GL**"), but refused to provide any other requested documentation or information. The GL maintained and provided by Defendants is attached hereto as **Exhibit 22**.

258.    After receiving the Lennar Sale 1 and Lennar Sale 2 Seller's Settlement Statements, and following Defendants' refusal to provide any documentation, MCE and its members became concerned that Defendants Mr. McCracken, Mr. Wood, and the Whitehall Entities were not acting in MCE's best interests.

259.    Accordingly, G & G took steps to remove the Whitehall Entities and/or Mr. McCracken from their position with MCE and revoke any and all of their authority.

260.    **Exhibit 23** attached hereto is the Action at Special Meeting by Written Consent of the Members of MCE ("**Removal Action**"), removing Mr. McCracken, WFC, and/or WFLLC as Special Managing Member(s) of MCE and revoking any and all of their authority to act on MCE's behalf.

261.    G & G, as manager of MCE, promptly notified all parties involved with the Project of the Removal Action and recorded a copy of the minutes of the Removal Action in the real property records of Arapahoe County, Colorado.

*L. The DFH Sale*

262.    Currently, MCE is in escrow for the sale of a portion of the Land (Filing #2) to DFH (the "**DFH Sale**"), and escrow was scheduled to close on December 21, 2021. The Purchase and Sale Agreement is attached here as **Exhibit 24**.

263.     While the Purchase and Sale Agreement was executed by Mr. Kristjansson in July 2021, the DFH Sale contract was entered into in prior to that by Defendants, purporting to act on behalf of MCE.

264.     Upon information and belief, Defendants intended to fraudulently wire any excess sale proceeds from the DFH Sale to Coscan in Nevada, like they had done in Lennar Sale 1 and Lennar Sale 2.

265.     Mr. Kristjansson re-executed the contract in Exhibit 24 after WFC, WFLLC, and Mr. McCracken were removed and stripped of their authority to act on behalf of MCE, through Exhibit 23.

266.     Heritage Title Company is currently serving as closing agent for the DFH Sale.

267.     The 2003 DOT and fraudulent 2019 DOT wrongfully encumber the portion of the Land contemplated to be sold in the DFH Sale.

268.     On December 16, 2021, Mr. McCracken, on behalf of his company MCE Funding, gave escrow for the DFH Sale a Beneficiary Demand for $4,311,916.92. A copy of the demand is attached here as **Exhibit 25**.

269.     Despite repeated demands, Mr. McCracken, Mr. Wood, and MCE Funding have failed and/or refuse to provide documents and records supporting the MCE Funding Beneficiary Demand of $4,311,916.92.

270.     The Seller's Estimated Settlement Statement prepared by escrow shows a payoff to MCE Funding in the amount of $4,311,916.92, leaving a seller's deficit of $2,746,816.68. The Estimated Statement is attached here as **Exhibit 26**.

271.    MCE, through its member G & G, has made repeated written demands to MCE Funding, Mr. McCracken, and Mr. Wood to remove the fraudulent 2019 DOT as an encumbrance on the Land.

272.    MCE Funding, Mr. McCracken, and Mr. Wood have refused to release the 2019 DOT.

273.    The 2019 DOT purports to secure the 2003 Note.

274.    MCE and G & G have made multiple written demands to MCE Funding, Mr. McCracken, and Mr. Wood for any documentation whatsoever regarding the amount owed by MCE under the 2003 Note.

275.    MCE Funding, Mr. McCracken, and Mr. Wood have refused to provide any documentation at all regarding the amount MCE purportedly owes to MCE Funding under the 2003 Note.  Such conduct is holding up the closing on the sale.

### M. The GL and Statement Provided by Defendants

276.    Defendants provided a single excel file purporting to show the balance owed on a "Coscan Loan to Murphy Creek Estates, LLC" (the "**Statement**"). A copy of the Statement, first provided in October 2021, is attached hereto in PDF form as **Exhibit 27**.

277.    Over the course of several months since April 2021, the amount that Mr. McCracken, Mr. Wood, and MCE Funding claim that MCE owes MCE Funding under the 2003 Note has fluctuated between approximately 4.1 million and well over 10 million, without any explanation or supporting documentation.

278.    The Statement provided in Exhibit 27, by its own terms, purports to be an amount owed to Coscan, not to MCE Funding.

279.    MCE has at all times denied, and continues to deny, that any amount is owed by MCE at all under the 2003 Note.

280.    MCE has at all times denied, and continues to deny, that any amount is owed by MCE at all to MCE Funding whatsoever.

281.    The only supporting document that any Defendant has ever provided with respect to any amount purportedly owed by MCE is the GL and the Statement.

282.    Collectively, both the GL and the Statement show that MCE Funding, Coscan, and the Whitehall Entities are, at minimum, commingling funds with one another.

283.    As can be seen in Exhibit 22, the GL does not provide any clarity about the various loan transactions that Mr. McCracken, Mr. Wood, and the Whitehall Entities caused MCE to enter into.

284.    For example, the GL contains a "Memo" column wherein the author of the GL could include notes regarding a specific transaction. Ex. 22.

285.    For many of the "Memo" entries within the GL, the notes provide short hand references to transactions, accounts, or documents that Plaintiff and G & G have never seen before and do not have access to. *Id*.

286.    For many of the "Memo" entries within the GL, the notes are cut off because of the format in which the GL was produced. *Id*.

287.    The GL also contradicts independent documents, such as the Sellers Settlement Statement from Lennar Sale 1 in Exhibit 16.

288.    For example, The GL was provided by Defendants as a document titled "MC Ledger through 2019."

289.    Accordingly, the GL purports to include transactions for MCE through the calendar year 2019, and a review of the GL shows that it includes at least some transactions from January 2020.

290.    The GL contains an entire section for transactions relating to a "Coscan Loan." *Id*. at 7-10.

291.    The "Coscan Loan" section of the GL contains a column labeled "Balance." *Id*.

292.    MCE disputes that any loan exists between MCE and Coscan or that any balance is owed by MCE to Coscan; however, upon information and belief, the "Balance" column of the "Coscan Loan" section of the GL contains the alleged balance that Defendants claim is owed to Coscan by MCE under an alleged "Coscan Loan." *Id*.

293.    As of August 17, 2018, the date of the closing on Lennar Sale 1, the entire balance owed by MCE to Coscan under the alleged "Coscan Loan" according to the GL provided by Defendants was only $1,877,173.37.

294.    Yet, for the Lennar Sale 1 that closed on August 17, 2018, Coscan made a demand and was paid out of escrow $3,345,739.62, nearly 1.5 million dollars more than the amount owed on that date according to Defendants' own records.

295.    Upon information and belief, Mr. McCracken and/or Mr. Wood caused Coscan to submit a fictitious payoff demand to escrow for Lennar Sale 1 closing.

296.    Upon information and belief, Mr. McCracken, Mr. Wood, and/or WFLLC caused the Lennar Sale 1 Coscan payoff demand of $3,345,739.62 to be approved by MCE, even though Mr. McCracken, Mr. Wood, and/or WFLLC knew that MCE did not owe $3,345,739.62 to Coscan.

297.    Coscan was in fact paid $3,345,739.62 out of the sale proceeds of Lennar Sale 1. *See*. Ex. 16.

298.    The "Coscan Loan" section of the GL does not show the payoff of $3,345,739.62 made to Coscan on August 17, 2018 from Lennar Sale 1.

299.    The GL instead depicts that the alleged balance owed by MCE on the "Coscan Loan" continued to increase, reaching a balance of $2,262,309.55 by January 29, 2020, without any payment depicted whatsoever.

300.    According to the GL maintained and provided by Defendants, as of January 29, 2020, the entire balance allegedly owed by MCE under the "Coscan Loan," was over 1 million dollars less than the payoff Coscan demanded in august of 2018.

301.    Upon information and belief, Defendants stole sale proceeds belonging to MCE and paid to Coscan from Lennar Sale 1.

302.    Upon information and belief, Defendants employed a similar scheme with respect to the sale proceeds from Lennar Sale 2. *See* Ex. 20.

303.    Even if accepted as true (which MCE explicitly disputes), the GL maintained and provided by Defendants fails to account for at least $4,677,752.40 that Mr. McCracken and/or Mr. Wood caused MCE to approve and pay to Coscan from escrow of Lennar Sale 1 and Lennar Sale 2.

304.    The GL is also inconsistent with property records recently discovered by Plaintiff.

305.    For example, although Mr. McCracken caused MCE to convey the Mineral Rights underlying the Land to Mr. McCracken's other entity, Homestead, there is no record of such a conveyance or transaction anywhere in the records provided by Defendants.

306.     In the "Coscan Loan" section of the GL, there are also transactions that purport to increase the alleged balance owed by MCE for "expenses paid on behalf of MCE," even where such items were in fact paid out of sale proceeds at escrow and can therefore not possibly be attributed to Coscan.

307.     On top of the 6,940,061.95 already paid to Coscan, Mr. McCracken, Mr. Wood, and MCE Funding now claim that $4,311,916.92 is owed by MCE to MCE Funding under the 2003 Note.

308.     Upon information and belief, no amount was ever owed by MCE under the expired 2003 Note.

309.     Upon information and belief, Defendants are fraudulently leveraging the 2003 DOT and fraudulent 2019 DOT to obtain payments for debts that, even if valid (which Plaintiff disputes), are not secured by the Land.

310.     Upon information and belief, the section of the GL titled "Loan-Murphy Crk Estates Funding" relates to the alleged balance owed by MCE under the 2003 Note. Ex. 22 at 11.

311.     The GL contains only four entries purporting to relate to "Loan-Murphy Crk Estates Funding."

312.     According to the GL provided by Defendants, the only amount allegedly borrowed under the 2003 Note was $750,000.00, with a memo that such amount was from the "Doctors-Funding Group".

313.     Upon information and belief, the "Doctors-Funding Group" referred to in the GL is Tom Clyde, Lawrence Wellman, Barbara Aanonson.

314.    Upon information and belief, Tom Clyde and Lawrence Wellman are doctors who reside in Colorado Springs, Colorado.

315.    Upon information and belief, the "Doctors-Funding Group" of Tom Clyde, Lawrence Wellman, Barbara Aanonson, rather than MCE Funding, actually loaned money to MCE.

316.    At minimum, MCE Funding is affiliated with Tom Clyde. *See* Ex. 6, wherein "Tom Clyde" is listed as the principal business address for MCE Funding.

317.    Tom Clyde, Lawrence Wellman, and Barbara Aanonson were paid off well in excess of $750,000.00, including any interest, according to the Seller's Settlement Statements from Lennar Sale 1 and Lennar Sale 2. *See* Exs. 16, 20.

318.    Plaintiff is unable to locate any entry in the GL provided by Defendants evidencing any loan made by MCE Funding to MCE.

319.    From its face, the GL suggests that MCE Funding, through Coscan, demands payment for expenses that neither MCE Funding nor Coscan ever incurred.

320.    From its face, the GL makes clear that Mr. McCracken and Mr. Wood were not observing any kind of corporate formalities, and that the funds of the Whitehall Entities, MCE Funding, and Coscan, at minimum, were commingled.

321.    For example, the Statement provided by Defendants in support of the amount Defendants claim MCE owes to MCE Funding is actually titled "Coscan Loan to Murphy Creek Estates, LLC." Ex. 27.

322.    Upon information and belief, Mr. McCracken and Mr. Wood use their entities Coscan, WFC, WFLLC, and MCE Funding interchangeably.

323.    Further, many entries on the GL contain memo notes such as "Paid by WFC for Coscan for MC"; "per Dan, Coscan paid for MC…"; and "Coscan (WFC) pd MGR for Murphy Creek."

324.    The entries such as those described in preceding paragraph 320 suggest that Mr. McCracken and Mr. Wood were not observing corporate formalities for the Whitehall Entities, MCE Funding or Coscan.

325.    The entries such as those described in preceding paragraph 320 suggest that Mr. McCracken and Mr. Wood were using each of their entities- WFC, WFLLC, MCE Funding, Coscan, and Homestead- interchangeably, and were consistently commingling the funds and assets of same.

326.    Further, the GL suggests that Mr. McCracken and Mr. Wood were also commingling the funds of MCE with the funds of the Whitehall Entities, MCE Funding, and Coscan to the detriment of MCE.

### N. Interference with Closing of DFH Sale

327.    Plaintiff has informed MCE Funding of Plaintiff's intent and desire to close on the DFH Sale, and of MCE Funding's intentional interference with the closing of the DFH Sale as a result of MCE Funding's refusal to release the fraudulent 2019 DOT or provide any documentation underlying the same.

328.    MCE Funding has persisted in its interference with the DFH Sale and submitted a demand to escrow for a wholly unsupported amount. Ex. 25.

329.    MCE has attempted to negotiate an escrow agreement that would allow the DFH Sale to close and to escrow the sale proceeds pending resolution of this dispute.

330.     MCE Funding has refused to enter into any escrow agreement whereby the sale proceeds would be held in escrow pending resolution of this Action.

331.     Plaintiff cannot reasonably close on the DFH Sale where the same would require paying Defendants $4,311,916.92 rightfully belong to MCE. Ex. 25, 26.

332.     Plaintiff cannot reasonably close on the DFH Sale where, as a result of MCE Funding's demand, Plaintiff would be required to pay funds in to escrow that it does not owe, and that it does not have because Defendants have refused to return the sale proceeds from Lennar Sale 1 and Lennar Sale 2 rightfully belonging to MCE.

333.     MCE Funding will not release the expired 2003 DOT.

334.     MCE Funding will not release the fraudulent 2019 DOT.

335.     Accordingly, Defendants are intentionally preventing MCE from closing on the DFH Sale.

336.     If MCE is unable to close on the DFH Sale, it will be in breach of its contract with DFH.

337.     An affidavit of Mr. Kristjansson setting forth relevant facts and verifying the allegations contained herein is attached hereto as **Exhibit 28**.

## CLAIMS FOR RELIEF

### First Claim for Relief
### (RICO- 18 U.S.C. § 1962(c) against all Defendants, except DFH)

338.     Plaintiff incorporates the above paragraphs.

339.     This count is against Defendants Mr. McCracken, Mr. Wood, WFC, WFLLC, MCE Funding, Homestead, and Coscan (the "Count 1 Defendants").

340.     The Count 1 Defendants form an enterprise that engages in and whose activities, particularly its use of interstate wires, affect interstate commerce within the meaning of 18 U.S.C. §§ 1961 and 1962.

341.     The Count 1 Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff. Specifically: Defendants committed wire fraud under 18 U.S.C. §1343 with respect to the sale proceeds of Lennar Sale 1 and Lennar Sale 2, and intend to continue their fraudulent scheme with respect to the DFH Sale.

342.     Based on the nature of the scheme, it was reasonably foreseeable to Defendants at all times during the Count 1Defendants' scheme that wires would be utilized to perpetrate the scheme.

343.     To date, the Count 1 Defendants have used wires in furtherance of their scheme to defraud Plaintiff by wiring excess sale proceeds from Lennar Sale 1 and Lennar Sale 2 in the State of Colorado, rightfully belonging to MCE, to Coscan, a Nevada corporation.

344.     The Count 1 Defendants' acts of wire fraud set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

345.     The Count 1 Defendants' acts of wire fraud are related to each other, defraud the same victim, and arose out of the same scheme concerning the Land.

346.     Because of the Count 1 Defendants' actions in directing the wire of sale proceeds from Lennar Sale 1 and Lennar Sale 2 to the foreign entity Coscan, Plaintiff, the rightful owner of the sale proceeds, has been damaged and denied the ability to have and use at least $6,940,061.95.

347.    Because of the Count 1 Defendants' actions in conveying portions of the Land through Lennar Sale 1 and Lennar Sale 2, and use of the wires in connection with each transaction, MCE has been damaged and deprived the use of portions of the Land.

348.    The Count 1 Defendants' acts of wire fraud are not isolated events as Count 1 Defendants intended to continue their scheme to defraud Plaintiff through the DFH Sale, and Count 1 Defendants intend to steal additional sale proceeds from Plaintiff from the DFH Sale by using fraudulent documents and liens.

349.    The Count 1 Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

350.    As a direct and proximate result of the Count 1 Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in both its business and property, with damages in an amount to be proven at trial.

**<u>Second Claim for Relief</u>**
**(Piercing the Corporate Veil- as to all Defendants except for DFH)**

351.    Plaintiff incorporates the above allegations.

352.    Defendants WFC, WFLLC, MCE Funding, Homestead and Coscan (the "**Entity Defendants**") are each alter egos of each other for reasons not limited to: each Entity Defendant has failed to maintain records, commingled funds with the other Entity Defendants, and routinely conducted transactions on behalf of other Entity Defendants.

353.    The Entity Defendants do not have a separate corporate existence and have been used to perpetrate a fraud upon Plaintiff.

354.    The Entity Defendants are each also the alter ego of Mr. McCracken and Mr. Wood for reasons not limited to: Mr. McCracken and Mr. Wood each have an ownership or other material financial interest in each of the Entity Defendants; Mr. McCracken and Mr. Wood have failed to observe corporate formalities and have commingled the funds of the Entity Defendants with each other and with their own personal funds; and Mr. McCracken and Mr. Wood have caused the Entity Defendants to conduct personal transactions on their behalf.

355.    Mr. McCracken and Mr. Wood have used the Entity Defendants to perpetrate a fraud upon Plaintiff.

356.    Under Colorado law, "[i]n any case in which a party seeks to hold the members of a limited liability company personally responsible for the alleged improper actions of the limited liability company, the court shall apply the case law which interprets the conditions and circumstances under which the corporate veil of a corporation may be pierced under Colorado law . . ." C.R.S. § 7-80-107(1).

357.    As a result of Defendants' actions, Plaintiff has been damaged in an amount to be determined at trial, and should be entitled to a judgment against all Defendants as alter egos of each other.

### Third Claim for Relief
### (Breach of Contract against Mr. McCracken, Mr. Wood, and Whitehall Entities)

358.    Plaintiff incorporates the above allegations.

359.    Defendants Mr. McCracken, Mr. Wood, WFC, and WFLLC agreed to be bound by the Operating Agreement via the First Amendment.

360.    Both the Operating Agreement and the First Amendment are valid, binding, enforceable contracts between Plaintiff and Mr. McCracken, Mr. Wood, WFC, and WFLLC.

361.    Defendants Mr. McCracken, Mr. Wood, WFC, and WFLLC each breached the First Amendment and the Operating Agreement through the following actions, without limitation: causing MCE to enter into unauthorized transactions, concealing important financial information and transactions from the members of MCE, misappropriating and stealing funds belonging to MCE, conveying the Mineral rights rightfully belonging to MCE without disclosure, authorization, or compensation paid to MCE, engaging in or causing MCE to engage in undisclosed self-dealing transactions with entities in which Defendants have a material financial interest, and intentionally taking bad faith actions that benefit Defendants and cause harm to Plaintiff.

362.    Plaintiff has been damaged as a result of Defendants' breach in an amount to be proven at trial.

### Fourth Claim for Relief
### (Unjust Enrichment against all Defendants except DFH)

363.    Plaintiff incorporates the above allegations.

364.    Coscan was paid $3,345,739.62 in sale proceeds from Lennar Sale 1 on August 17, 2018, and $3,594,322.33 from Lennar Sale 2 on March 23, 2021.

365.    Despite repeated demands, Coscan, and/or Defendants as alter egos of Coscan, have refused to provide any documentation or information otherwise supporting the amount paid to Coscan from Lennar Sale 1 and Lennar Sale 2.

366.    In total, Coscan has received $6,940,061.95 of the sale proceeds from Lennar Sale 1 and Lennar Sale 2 without any justification.

367.    The Whitehall Entities and Mr. McCracken, or remaining Defendants as their alter egos, caused $6,940,061.95 to be paid to Coscan.

368.    The payment of $6,940,061.95 to Coscan benefits Coscan, and all other Defendants as alter egos thereof.

369.    The payment of $6,940,061.95 to Coscan is to the detriment of MCE because it deprives MCE of funds that otherwise belong to MCE.

370.    To date, Plaintiff has yet to receive any sale proceeds from either Lennar Sale 1 and/or Lennar Sale 2.

371.    Further, Mr. McCracken, and/or remaining Defendants as his alter egos, caused MCE to convey the Mineral Rights underlying the Land to Homestead, and then subsequently caused Homestead to lease and/or convey those same Mineral Rights.

372.    Mr. McCracken, Homestead, and/or the remaining Defendants as their alter egos, benefitted from the transactions involving the Mineral Rights because Defendants were paid consideration for such Mineral Rights.

373.    Because of Defendants' actions, MCE has been deprived of any consideration for the Mineral Rights underlying the Land.

374.    Under these circumstances, it would be unjust to allow Coscan, and all other Defendants as alter egos thereof, to retain the sale proceeds from Lennar Sale 1 and Lennar Sale 2 without compensating Plaintiff equitably.

**Fifth Claim for Relief**
**(Civil Theft C.R.S. § 18-4-405 against all Defendants except DFH)**

375.    Plaintiff incorporates the above allegations.

376.    Defendants, each acting as alter egos of one another, exercised control over sale proceeds from Lennar Sale 1 and Lennar Sale 2 rightfully belonging to MCE.

377.    Mr. McCracken and/or WFLLC caused Coscan to be paid a total of $6,940,061.95 of the sale proceeds from Lennar Sale 1 and Lennar Sale 2.

378.    Mr. McCracken and/or WFLLC knew that Coscan had no right to the sale proceeds.

379.    Mr. McCracken and/or WFLLC knew that the sale proceeds rightfully belonged to MCE.

380.    Coscan, and all Defendants as alter egos of Coscan, have retained the $6,940,061.95 of the sale proceeds rightfully belonging to MCE with the intent to permanently deprive MCE of the same.

381.    Mr. McCracken and/or WFLLC caused Tom Clyde, Lawrence Wellman, and Barbara Aanonson to be paid $1,999,790.33 of the sale proceeds from Lennar Sale 1 and Lennar Sale 2.

382.    McCracken and/or WFLLC knew that the $1,999,790.33 paid to Tom Clyde, Lawrence Wellman, and Barbara Aanonson rightfully belonged to MCE.

383.    Upon information and belief, McCracken and/or WFLLC caused the $1,999,790.33 to be paid to Tom Clyde, Lawrence Wellman, and Barbara Aanonson in repayment of debt for which MCE was not the obligor, but for which any or all of the Entity Defendants were the obligor(s).

384.    Mr. McCracken, WFLLC, and all other Defendants as their alter egos, caused the $1,999,790.33 to be paid to Tom Clyde, Lawrence Wellman, and Barbara Aanonson with the intent to permanently deprive MCE of the same.

385.    Mr. McCracken, and/or remaining Defendants as his alter egos, caused MCE to convey the Mineral Rights underlying the Land to Homestead, and then subsequently caused Homestead to lease and/or convey those same Mineral Rights.

386.    Mr. McCracken, Homestead, and/or remaining Defendants as their alter egos, took the Mineral Rights underlying the Land with the intent to permanently deprive MCE of the same.

387.    McCracken, Homestead, and/or remaining Defendants as their alter egos took the proceeds from the lease or sale of such Mineral Rights to third parties, with the intent to permanent deprive MCE of the same.

388.    Because of Defendants' actions, MCE has been deprived of any consideration for the Mineral Rights underlying the Land.

389.    As a result of Defendants' actions, MCE has been damaged in an amount to be proven at trial.

**Sixth Claim for Relief**
**(Civil Conspiracy to Commit Theft against all Defendants except DFH)**

390.    Plaintiff incorporates the above allegations.

391.    Mr. McCracken, Mr. Wood, and the Entity Defendants conspired with one another to steal both the sale proceeds from Lennar Sale 1 and Lennar Sale 2, and the Mineral Rights, from MCE.

392.    Mr. McCracken, Mr. Wood, and the Entity Defendants each intended to conceal their actions in order to perpetrate the theft upon MCE, with the intent to steal the sale proceeds and Mineral Rights rightfully belonging to MCE.

393.     Mr. McCracken, Mr. Wood, and the Entity Defendants did in fact steal the sale proceeds from Lennar Sale 1 and Lennar Sale 2, and the Mineral Rights, from MCE.

394.     As a result of Defendants' actions, Plaintiff has been damaged in an amount to be proven at trial.

**Seventh Claim for Relief**
**(Breach of Fiduciary Duty against**
**WFC, WFLLC, Mr. McCracken, Mr. Wood)**

395.     Plaintiff incorporates the above allegations.

396.     WFC, WFLLC, Mr. McCracken, and Mr. Wood owed a fiduciary duty to MCE.

397.     WFC, WFLLC, Mr. McCracken, and Mr. Wood, and all other Defendants as their alter egos, breached their fiduciary duty owed to Plaintiff for reasons including, without limitation: causing MCE to enter into unauthorized transactions that did not benefit MCE in any manner whatsoever, concealing important financial information and transactions from MCE and its members, misappropriating and stealing funds rightfully belonging to MCE, conveying the Mineral rights rightfully belonging to MCE without disclosure, authorization, or compensation paid to MCE, engaging in or causing MCE to engage in undisclosed self-dealing transactions with entities in which Defendants have a material financial interest, by usurping corporate opportunities, and by intentionally taking bad faith actions that benefit Defendants and cause harm to Plaintiff.

398.     Such conduct has proximately damaged MCE in an amount to be determined at trial.

**Eighth Claim for Relief**
**(Fraud against all Defendants except DFH)**

399.   Plaintiff incorporates the above allegations.

400.   Mr. McCracken and/or Mr. Wood, and all other Defendants through Mr. McCracken and/or Mr. Wood as their alter egos, have perpetrated a large scale multi-year fraud against Plaintiff, as set forth in the preceding paragraphs of this Complaint.

401.   Mr. McCracken and/or Mr. Wood, and all other Defendants through Mr. McCracken and/or Mr. Wood as their alter egos, made false representations of material facts to Plaintiff, including without limitation statements made concerning Mr. McCracken and/or Mr. Wood's ownership or material financial interest in each of the Entity Defendants; information concerning any loan agreements made between MCE and any of the Entity Defendants, Duane M. Freund, LLC, Tom Clyde, Barbara Aanonson, Lawrence Wellman, or Kathy McCracken; information concerning the conveyance and/or lease of the Mineral Rights; and information concerning Lennar Sale 1 and Lennar Sale 2 and the respective payoffs from escrow.

402.   Defendants knew these statements to be false, and intended for Plaintiff, its member(s), and their predecessors to rely on such statements.

403.   Plaintiff and its members were unaware that such statements by Defendants were false, and had no reason to know that such statements were false.

404.   Plaintiff and its members relied on Defendants statements and have been damaged in an amount to be proven at trial.

405.   Mr. McCracken and/or Mr. Wood, and all other Defendants through Mr. McCracken and/or Mr. Wood as their alter egos, knowingly and intentionally concealed material information from Plaintiff and its members, including without limitation: information concerning

Mr. McCracken and/or Mr. Wood's ownership or material financial interest in each of the Entity Defendants; information concerning any loan agreements made between MCE and any of the Entity Defendants, Duane M. Freund, LLC, Tom Clyde, Barbara Aanonson, Lawrence Wellman, or Kathy McCracken; information concerning the conveyance and/or lease of the Mineral Rights; and information concerning Lennar Sale 1 and Lennar Sale 2 and the respective payoffs from escrow.

406.    Defendants should have disclosed such material information to Plaintiff and its members.

407.    Defendants failed to disclose such material information to Plaintiff and its members in an effort to conceal Defendants' actions such that Plaintiff and its members would allow the Whitehall Entities, through Mr. McCracken and Mr. Wood, to continue to serve as Special Managing Member of MCE.

408.    Plaintiff was unaware of the concealed and undisclosed information until approximately 2021.

409.    Defendants' material misstatements and omissions/concealment caused damages to Plaintiff in an amount to be proven at trial.

## Ninth Claim for Relief
### (Civil Conspiracy to Commit Fraud against all Defendants except DFH)

410.    Plaintiff incorporates the above allegations.

411.    Mr. McCracken, Mr. Wood, and the Entity Defendants conspired with one another to perpetrate a fraud against Plaintiff.

412.    Mr. McCracken, Mr. Wood, and the Entity Defendants each intended to conceal

their actions in order to perpetrate the theft upon MCE, with the intent to steal the sale proceeds

and Mineral Rights rightfully belonging to MCE.

413.    Mr. McCracken, Mr. Wood, and the Entity Defendants did in mispresent and/or

omit material information to Plaintiff as part of their scheme to steal the sale proceeds and

Mineral Rights from MCE.

414.    As a result of Defendants' actions, Plaintiff has been damaged in an amount to be

proven at trial.

## **Tenth Claim for Relief**
**(Declaratory Relief Pursuant to Fed. R. Civ. P. 57, 28 U.S.C. § 2201, and Colo. R. Civ. P. 57 as to the 2003 Note against MCE Funding)**

415.    Plaintiff incorporates the above allegations.

416.    Under Colo. R. Civ. P. 57, the dispute between Plaintiff and Defendants involves

rights pertaining to the 2003 Note.

417.    An actual and substantial dispute exists between the parties concerning the 2003

Note.

418.    Plaintiff asserts that the 2003 Note is not enforceable against MCE for the

following reasons, without limitation: the MCE Note was not funded by MCE Funding; any

amounts purportedly provided to MCE under the auspices of the 2003 Note have been repaid in

full by MCE; the 2003 Note has not been extended or otherwise modified in any way; and/or the

MCE Note matured in November 2007 and its enforcement is barred by the statute of limitations

and/or the doctrines of waiver, estoppel, and/or laches. *See* C.R.S. § 13-80-103.5.

419.     Any action by MCE purporting to modify or extend the 2003 Note cannot be binding against MCE because it was perpetrated by Defendants in furtherance of their fraud. *See* Ex. 18.

420.     MCE Funding claims at least $4,311,916.92 is presently owed by MCE to MCE Funding under the 2003 Note. *See* Ex. 25.

421.     Plaintiff is entitled to a judicial determination of the validity and enforceability of the 2003 Note.

422.     A prompt judicial determination of the respective rights of the parties is necessary and appropriate under the circumstances alleged in this Verified Complaint.

**Eleventh Claim for Relief**
**(Declaratory Relief Pursuant to Fed. R. Civ. P. 57, 28 U.S.C. § 2201, and Colo. R. Civ. P. 57 as to the 2003 DOT and 2019 DOT against MCE Funding)**

423.     Plaintiff incorporates the above allegations.

424.     Under Colo. R. Civ. P. 57, the dispute between Plaintiff and Defendants involves rights pertaining to the 2003 DOT and the 2019 DOT.

425.     An actual and substantial dispute exists between the parties concerning the 2003 DOT and 2019 DOT.

426.     Plaintiff asserts that the 2003 DOT no longer secures any indebtedness owed by MCE.

427.     Further, the 2003 DOT was extinguished when the statute of limitations ran on the 2003 Note, on or about November 2, 2013. C.R.S. § 38-39-207.

428.     MCE Funding asserts that the 2003 DOT is valid and refuses to release the 2003 DOT, hindering the DFH Sale.

429.    Plaintiff asserts that the 2019 DOT is fraudulent and unenforceable against MCE.

430.    MCE Funding asserts that the 2019 DOT is valid and refuses to release the 2019 DOT, hindering the DFH Sale.

431.    Plaintiff is entitled to a judicial determination of the validity and enforceability of the 2003 DOT and 2019 DOT.

432.    A prompt judicial determination of the respective rights of the parties is necessary and appropriate under the circumstances alleged in this Verified Complaint.

**Twelfth Claim for Relief**
**(Intentional Interference with a Contract- against Mr. McCracken, Mr. Wood, and MCE Funding)**

433.    Plaintiff incorporates the above allegations.

434.    Mr. McCracken, Mr. Wood, and MCE Funding are aware of the DFH Sale and the corresponding contract between MCE and DFH.

435.    Mr. McCracken and/or Mr. Wood caused MCE Funding to knowingly submit a demand to escrow for the closing of the DFH Sale for an amount that it is not entitled to.

436.    Mr. McCracken, Mr. Wood, and MCE Funding each know that MCE Funding is not entitled to the amount it is demanding with respect to the DFH Sale.

437.    MCE Funding's escrow demand is based on the 2003 Note, which is unenforceable and under which MCE owed no debt, and upon the 2003 DOT and 2019 DOT, both of which are invalid.

438.    Mr. McCracken, Mr. Wood, and MCE Funding each know that the 2003 DOT and 2019 DOT are invalid.

439.     MCE Funding's escrow demand, and refusal to release the invalid liens on the

Land, have made it impossible for MCE to perform its obligations under the DFH Sale contract.

440.     Mr. McCracken, Mr. Wood, and MCE Funding are improperly interfering with

the DFH sale in furtherance of their fraud perpetrated on Plaintiff.

441.     As a result of Defendants' actions, Plaintiff is at risk of being sued for breach of

contract by DFH.

442.     As a result of Defendants' actions, Plaintiff has been damaged in an amount to be

proven at trial.


**Thirteenth Claim for Relief**
**(Preliminary Mandatory Injunctive Relief - Against MCE Funding and DFH)**

443.     Plaintiff incorporates the above allegations.

444.     Plaintiff seeks a preliminary mandatory injunction pursuant to Fed. R. Civ. P. 65.

445.     For the reasons set forth above, Plaintiff is entitled to an order granting mandatory

injunctive relief, specifically requiring that MCE Funding withdraw its escrow demand so that

the DFH Sale may close, and further ordering that all sale proceeds remaining after necessary

expenses and closing costs are paid shall be placed in escrow or in the court registry pending

further orders from the Court.

446.     MCE faces real, immediate, and irreparable harm that will be prevented by this

mandatory injunctive relief.  MCE cannot close on the sale of the Land to DFH without Court

Intervention and, without Court intervention, MCE will be in breach of its contract with DFH.

447.     This mandatory injunctive relief would also protect the interests of DFH, a party

not involved in the remaining disputes between the parties, but whose interests are adversely

impacted by MCE Funding's escrow demand.  DFH is an innocent party who merely wants to purchase the Land.

448.     Although MCE seeks mandatory and not prohibitive injunctive relief, the requested relief would nonetheless preserve the status quo pending trial on the merits of MCE's other claims because it would allow the Court to adjudicate the validity of the contracts and liens that MCE Funding's escrow demand is based upon prior to any sale proceeds being distributed to any party.

449.     There is no other plain, speedy, and adequate remedy at law.

450.     The public interest would not be disserviced by the requested relief. Rather, the requested relief is in the interests of the Colorado public as it would allow the construction of homes to proceed.

451.     The balance of the equities favors granting the mandatory injunctive relief where the prejudice to both MCE and DFH is severe, but MCE Funding's interests would be protected by the order requiring the sale proceeds to be placed in the court registry pending further order of the Court.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment on all claims in its favor and against all Defendants, except DFH; a decree adjudicating that the 2003 Note is unenforceable against MCE; a decree adjudicating that both the 2003 DOT and the 2019 DOT are invalid, extinguished, or otherwise unenforceable liens, and releasing the same as encumbrances on the

Land; an order granting mandatory injunctive relief requiring MCE Funding to withdraw its escrow demand for the DFH Sale, so that the DFH Sale may close under the terms of the contract, and requiring Plaintiff and/or the closing agent to deposit any excess sale proceeds from the DFH Sale into the court registry pending further order of the Court; an award of damages in an amount to be determined at trial, including costs, treble damages pursuant to statute, reasonable' attorney fees, all applicable interest, as well as any additional remedy that the Court deems just and proper.

Dated:  February 2, 2022.

Respectfully submitted,

MONTGOMERY LITTLE & SORAN, PC

/s/ *Nathan G. Osborn*
Nathan G. Osborn, #38951
Robin A. Jackson, #48959
5445 DTC Parkway, Suite 800
Greenwood Village, Colorado 80111
Telephone: (303) 773-8100
Fax: (303) 220-0412
E-mail:  nosborn@montgomerylittle.com
            rjackson@montgomerylittle.com
*Attorneys for Plaintiff Murphy Creek Estates, LLC*